13208

DAVENPORT v. COLLINS ET AL.

(159 S. E., 787)

388

390

398

404

414

416

424

*Messrs. Lyles & Daniel,* for plaintiff-appellant, and *Thomas F. McDow,* for defendants-appellants, Frances, Harold and Kathleen Collins, 

*Messrs. Bomar & Osborne, Nichols, Wyche & Byrnes* and *I. C. Blackwood,* for defendants, J. Duren Collins and R. E. L. Collins, 

*Mr. Harvey W. Johnson,* guardian *ad litem* for defendant, Ethel Collins, *non compos mentis,* 

July 21, 1931.

The opinion of the Court was delivered by Mr. Chief Justice Blease.

It is with great regret I find myself unable to agree with the proposed opinion of Mr. Justice Cothran; likewise, I am disappointed that I cannot approve the two decrees of Hon. T. S. Sease, Circuit Judge, appealed from herein. I submit the following as my idea of what the opinion of the Court should be in this case.

John D. Collins was long a wealthy and successful merchant at Spartanburg. His chief enterprise was a department store located on east Main Street, known as the Bee Hive.

He had several branch stores, at Union, Greer, and Landrum.

He had 12 children by his first wife, who predeceased him. Five of these were over 25 at his death, two were between 21 and 25, and five were under 21. His fourth child, a daughter, had long been hopelessly insane, and was and is confined in the State Hospital for the Insane. Mr. Collins, in his will, made no provision whatever for her.

His second wife survived him. He had undertaken a prenuptial settlement with her, whereby she was to relinquish all right in his estate in consideration of $10,000.00 to be paid her after his death.

He died in November, 1925, leaving the will and codicils involved here. His estate was valued at $500,000.00.

His widow repudiated the prenuptial settlement, and, in an action brought by the executor to compel her acceptance, was paid $37,500.00.

The Bee Hive storehouse and lot on east Main Street is by far the most valuable piece of real estate. It was a four-story and basement brick building, fronting 53 feet on Main, and running back with that width about half way to Broad, and continuing to Broad with a width of 25 feet. The building on the narrow Broad Street portion was brick, one story and basement.

In March, 1929, this building and all fixtures and stocks contained in it (and the stocks of all the branch stores except one had been brought into it) were totally destroyed by fire. There was $47,500.00 insurance on the building and $58,-000.00 on the goods. During the pendency of this litigation, several banks in North Carolina, in which the executor had deposited the greater portion, if not all, of the insurance money, closed their doors. It is probable that there has been a great loss on this account to the estate of Mr. Collins.

There had long been a barber shop in the Main Street basement, which testator had rented, and which was not connected with the business.

After the fire, responsible parties offered to rent the ground, erect a modern, fully equipped building to cost not less than $90,000.00, at their own cost, pay taxes and insurance, and rent it for 30 years at an annual rental commencing at $10,000.00 per year, and advancing to $12,000-.00 in five years, and to $15,000.00 in ten years, the building to belong to the owners when the lease terminates. It is next to the Kress store, whose lease is on the same terms, and whose building had been erected.

By reason of the death of his first wife after the will was made, and by reason of the testator's having sold, in his lifetime, the only real estate attempted to be disposed of by the will, there are no specific bequests or devises to be considered, and the questions presented are merely different forms of asking what the testator did with his personal and real property.

The plaintiff commenced this action in the Court of Common Pleas of Spartanburg County against her brothers and sisters, her stepmother and Mr. Lee, the executor named in the will, for a construction of the will. The complaint, one of much length, really sought to allege, if it did not clearly do so, that it was impossible to determine the intention of the testator from the language of the instrument, and contended that, for that reason, it was not a valid will. This statement is made because the complaint points out many, many instances of irreconcilable conflict in the provisions of the will.

It appears that the widow, Mrs. Pearl W. Collins and two of the children, William A. Collins and Edward McAlpine Collins, did not answer. Several separate answers were filed in behalf of the other defendants, they being represented in all by at least eleven attorneys. The defendants, who urge the validity of the will and claim that its terms are plain, in almost every instance disagree as to a construction of the language of the instrument. J. Duren Collins and R. E. L. Collins, who, if the will is sustained, appear to have been the greatest recipients of their father's bounty, are in much

doubt as to what his intention was, but ask that the instrument be held to be valid. The executor begs the Court to instruct him.

Two of the defendants, Francis E. and Harold Collins, in their answer, boldly attacked the validity of the instrument and said, "that the will and codicils disclose a continuity of testamentary intention, failing of comprehensiveness to reconcile the mutually destructive force of various parts of the provisions and directions, and that the rejection of those which must be rejected will result in the defeat of the testator's whole intent, and therefore, by reason of the impossibility of execution of some of the provisions, the irreconcilable conflict between others, the unlawfulness of others, the will cannot be executed and except for the appointment of the executor and testamentary guardian, is without force and effect, and should be so declared."

The testimony in the case was taken by the Master, but he did not pass upon the legal questions involved. The cause was heard by his Honor, Circuit Judge Sease, who passed a decree construing the will, and provided therein that, if any matter had been omitted by oversight, the parties might apply to have the same determined in a supplemental decree. From that decree, the plaintiff and all the answering defendants appealed. Later, the plaintiff in a supplemental complaint asked for a more definite determination of certain questions alleged to have been overlooked, and by agreement the appeal was suspended until those questions could be determined. The attention of the Court was called to the burning of the store building. From the supplemental decree of Judge Sease, all the active parties, except the minor defendants, Kathleen Collins, Mildred Collins, Miriam Collins, Dorothy Collins, and Ethel Collins, *non compos mentis,* appeal to this Court.

The case has been in this Court many months, and has been well and carefully considered. We have had two arguments before the Court, granting additional time therein to the attorneys that their views could be clearly presented.

We realize that our Courts should hesitate a long, long time before declaring that a testator's will should be set aside because of confusion and ambiguity in its terms. When a Court, after long-continued study and careful examination, cannot ascertain a testator's intention from the instruments he has left as his will, there is nothing left for the Court to do but to declare the instrument invalid. Some of the language in the argument of C. E. Daniel, Esq., attorney for the plaintiff, is so apropos of what we have in mind that we take the liberty to quote it.

"From the terms of the will and codicil, it is impossible to deduce a sustained intent which can be effectuated.

"The application of the rules of construction (which come into play only when the intent is not apparent) produces results equally confusing and impossible.

"The rules, in substance, are: The intent must govern; it must be gathered from the will; every word and clause must, if possible, be given effect; the construction must be by the entirety, and not *per parcella;* the deduced intent must be so strong as to leave no doubt in the mind of the Court, and may not rest on conjecture; the presumption is that testator intended to dispose of his entire estate; the law favors the construction most nearly in conformity with the statute of distributions; double portions are disfavored; Courts are not permitted, under the guise of interpretation, to incorporate provisions; of two inconsistent provisions, the *latter* prevails; but only when it is as plain and decisive as the first; the just, natural and reasonable disposition is favored. See 21 R. C. L., 217–234, and 40 Cyc., 1396 to 1417.

"From the language of the will and codicils, we can discern no completed intent, no main and sustained purpose, but only fragmentary designs, each a closed system in itself, and each disrupted by the forgotten provisions that slipped the testator's mind when he attempted to formulate his subsequent incomplete schemes. We do not think the Court can believe that when he wrote his last codicil, the testator had

in mind fitting it into a testamentary scheme carrying through the will to which it was a codicil. His intent, if any, is broken, unrelated, intermittent. He had not 'thought through it.' "

Hardly two of the lawyers engaged in this cause, who had studied for many months the will and codicils in question, have agreed as to the meaning of any single provision therein. The learned Circuit Judge, who evidently gave much thought and study to the instruments, at last, as shown by a careful reading of his decrees, had to resort to conjecture and supposition upon which to base his conclusions. In his decrees, as we see it, he made a will for the testator. It is impossible for us to say, however, if the testator intended to make such a will. Our learned brother, Mr. Justice Cothran, who never tires in his efforts to see that a cause is justly decided, after an extended study of the instruments, seeking all the time to sustain their validity, has, in our opinion, made a will for the testator, perhaps, one the testator might have made for himself if he had understood the laws relating to wills. But who can say that the testator would have made the will Mr. Justice Cothran thinks he intended to make?

The will and codicils speak for themselves. They say to us only one thing which we may plainly understand, this: The testator, controlled by the motive which moves many mortals, the desire to have something made by him last forever, wished to see his handiwork, the Collins' Bee Hive, continue just as long as it might continue in the same manner he had built it. Already, fire and closed banks have shown the impossibility of carrying out the testator's plans, even if they could be ascertained. "Man proposes and God disposes." Testator's desire that mortal things should become immortal caused him to write a will, which, in our opinion, is so confusing and ambiguous that it is impossible for its terms to be carried out, even if the terms could be understood. Let the will and codicils and the decrees of the Circuit Judge be reported.

We have endeavored to apply every recognized rule for the construction of wills, in an effort to discover the intentions of the testator. When, following any given rule, we have thought his intention had been ascertained, then we found we had run counter to some other rule or to some positive declaration of the law forbidding the application of the rule. Everywhere there was only ambiguity, conflict, confusion, guess, conjecture, supposition, and mystery.

Every time we have read the will and codicils of the testator, we have reached a different conclusion as to what he intended to do. No two members of the Court are able to agree as to his intention regarding any one important matter involved in the will. In only one thing is there certainty, that is, as to the appointment of the executor, and that provision alone may stand.

"The Courts will hold a will void in its entirety for uncertainty when, after consideration of all its provisions and all the matters which shed light on it and make it certain, it remains so obscure, indefinite, and ambiguous that no definite idea of the testator's intention can be formed. It is only in such an extreme case, however, that the Courts declare a whole will void for uncertainty, regardless of how they may hold on the certainty or uncertainty of particular devises or bequests." 40 Cyc., 1092.

"Where the words of a will, aided by evidence of material facts, are insufficient to determine testator's meaning, no evidence will be admissible to prove what he intended, and the instrument is void for uncertainty." *Steele v. Crute,* 208 Ala., 2, 93 So., 694, 695.

"Uncertainty of expression and doubtful meaning does not absolve the Court from the duty of interpreting a will, unless it is so vague and so indefinite as to render the purpose and meaning incomprehensible." *In Re: Allen's Will,* 111 Misc. Rep., 93, 181 N. Y. S., 398.

"In the construction of a will, Courts are not permitted to supply what the testator has failed to indicate, and if after

every endeavor the judicial expositor finds himself unable in regard to any material fact to penetrate through the obscurity in which the testator has involved his intention, the intended disposition fails." *Wise v. Rupp,* 269 Pa., 505, 112 A., 548.

It was exceedingly unfortunate that the testator, who was such an excellent business man, did not, in drawing his will and the codicils thereto, go about the very important matter of disposing of his large estate in a more careful manner, and that he did not obtain, in the preparation of all these instruments, expert legal assistance. This Court would be glad, indeed, to give full force and effect to what he attempted to do, if we were able to ascertain his intentions, and if those intentions were not contrary to positive rules of the law. Fortunately, in instances of this kind, which we are pleased to say are very rare, our laws relating to the disposition of intestate estates have made very fair and just provisions, and these may be easily carried into effect.

The judgment of this Court should be that the will and codicils involved in this proceeding are too uncertain, confusing, vague, and ambiguous to be declared valid testamentary instruments, except as to the appointment of the executor; and, with the exception stated, that they be declared invalid, and the cause should be remanded to the lower Court for such proceedings as are consistent herewith.

A majority of the Court concurring in this opinion, it becomes the judgment of the Court.

MR. JUSTICE STABLER and MR. ACTING ASSOCIATE JUSTICE COSGROVE concur.

MR. JUSTICE CARTER concurs in result.

MR. JUSTICE COTHRAN (dissenting): This is an action, commenced January 12, 1927, by the plaintiff a daughter of John D. Collins, who died testate November 19, 1925, against the executor of his will, his widow, and eleven brothers and sisters of the plaintiff, for the purpose of having a construction of the will adjudicated, and proper instructions given to the executor in the administration of the estate.

John D. Collins, the testator, had been engaged in business for many years in the city of Spartanburg; his principal mercantile business was known as the Bee Hive, fronting on Main Street, in the center of the retail trade; it was located in a building which was filled with a large stock of merchandise, dry goods, and groceries; he maintained also branch stores at Union, Landrum, and Greer; he owned the store building in Spartanburg and other real estate, and carried life insurance of $50,000.00; his entire estate was appraised at about half a million dollars.

The defendant, James H. Lee, who was named executor in the will, duly qualified and took charge of the estate including the real estate, the stocks of merchandise, and other personal property. The appraisement of the merchandise in the four places of business amounted to nearly $120,000.00. The executor brought into the Bee Hive the stocks of goods from the Union and Greer stores, but not from the Landrum store, and operated the business at both places from the time of his qualification until the Spartanburg store, with much of its contents, was destroyed by fire on March 18, 1929, as will be later referred to.

The will, dated August 13, 1915, was followed by three codicils: (1) January 2, 1924; (2) January 26, 1924; and (3) June 24, 1925.

It is conceded on all sides that there has been no testamentary disposition in the will and codicils of the fee to any of the real estate, except that to a house and lot referred to in Item 4 of the original will, which appears to have been disposed of by the testator in his lifetime by deed; it of course cuts no figure in this discussion.

By the original will, the testator bequeathed all of his personal property, which included the stock of goods in the Bee Hive and in the three branch stores, to his executor, James H. Lee, in trust, for the following uses and purposes:

In Item 2, subdivision A, the trustee was directed to convert all of the personal property into cash and to invest the

same in such securities as his good judgment indicated until the times prescribed for the distribution of the "corpus of my estate."

In the same item, subdivision B, the trustee was directed to invest one-tenth of the moneys coming from his personal estate as provided in subdivision A, for the benefit of his wife, Lillian, upon certain conditions and limitations, which, by reason of her death and the testator's remarriage, are not of interest in this controversy, except the provision that, in the event of her death intestate, the fund should be held in trust for the daughters, of whom there were five, of the testator.

There remained, after the disposition of the one-tenth to his wife, Lillian, nine-tenths of the proceeds of the conversion provided for in subdivision A, which in the same item, subdivision C, he directed to be held in trust for the support, education, and maintenance of his children then living (at that time there were several under age), "until each of my said children shall have arrived at the age of twenty-one years."

In the same item, subdivision E, it was provided: "Subject to the provisions above named, I direct that the remaining nine-tenths of my personal estate shall be equally divided among all of my children, each child to receive one-half of his or her share when such child shall arrive at the age of twenty-one years, and the balance upon arriving at the age of twenty-five years. But in. the meantime each child shall receive the actual income from the unpaid portion of his or her legacy, that is between the ages of twenty-one and twenty-five years. In case my daughter or daughters shall become entitled to the share of my estate heretofore directed to be set apart for the benefit of my wife, by reason of her second marriage or death, then I direct that my executor shall hold the same and pay it out to my daughter or daughters as above provided; or in the case of their death, then to be divided equally among my other children who may then be

living, upon such conditions as is hereinbefore provided for the division and distribution of the other portion of my personal estate."

There does not appear to be an Item 3.

In Item 4 a disposition is made of the real estate hereinbefore referred to as having been disposed of in the testator's lifetime.

In Item 5, it is provided: "I direct that all my other real estate of every kind and description consisting of houses, lots, lands, store building and other buildings shall not be sold until my youngest child shall have reached the age of forty years. It is my desire that my said real estate, and any other that I may die possessed of shall be rented by my executor, or by someone lawfully handling it as his agent, and all rents which shall accrue from property, after paying insurance and taxes and a small sum for necessary or reasonable repairs or improvements, shall be divided among my children as follows:" (here follows a scheme of division which is not of interest).

Items 6 and 7 may be passed over.

Item 8 provides: "If any of my real estate should be damaged or destroyed by fire and not sufficiently covered by insurance to repair the damage or rebuild, my executor is hereby directed to appropriate a sufficient sum from the income of my real estate to rebuild or repair, as in his judgment may be deemed sufficient, so that my real estate may be kept in an income-producing condition."

Item 9 provides: "After paying all taxes, insurance, repairs or rebuilding, as before directed, from the income of my estate, my executor is directed to distribute the balance of the income from the said real estate as specified in Item 5 of this will for the support, education and maintenance of my children."

The remaining items may be passed over.

Codicil No. 1, having been revoked by codicil No. 3, may be disregarded. Codicil No. 2 is not pertinent to the controversy.

Codicil No. 3 makes an important change in Item 2, subdivision A of the original will. That item directs the conversion of the entire personal estate; codicil No. 3 provides for the disposition of the stock of goods in the Bee Hive and in the branch stores, thus:

"After sufficient merchandise has been sold to pay all my indebtedness; the balance of the stock of merchandise is to be inventoried at the original cost and sold to J. Duren Collins, Jr., and R. Lee Collins, providing the following stipulations are conformed to in every sense of the word:

"The stock shall be discounted for depreciation reckoning from original first cost, not more than one-fourth ($\frac{1}{4}$) or 25 per cent off of the original cost. I will and direct that this stock is to be sold to J. Duren Collins, Jr., and R. Lee Collins, providing that at no time until they have fully paid for the stock shall they borrow money, or buy merchandise on credit to exceed an amount equal to more than one-fourth ($\frac{1}{4}$) of the value of this stock, at the time it may be transferred to them. In other words, their total indebtedness shall not exceed more than one-fourth ($\frac{1}{4}$) of the stock of merchandise for which they are to pay net after discounting. That is the indebtedness for borrowed money and merchandise bought on credit combined must not aggregate an amount equal to more than one-fourth of what the inventory shows after a deduction of one-fourth for depreciation.

"I will and direct that J. Duren Collins, Jr., and R. Lee Collins are to be charged no rent for twelve months, and the stock shall be turned over to them without any cash payment. I will and direct that they look after the maintenance and education of my children under twenty-one years of age.

"I will and direct that after the first year they are to pay a rental of not over Five Hundred ($500.00) Dollars per month and in addition they are to pay on the purchase price of the stocks of goods transferred to them the sum of Three Hundred ($300.00) Dollars per month until the debt for the stock of merchandise is fully paid."

After the death of the testator in November, 1925, and the taking possession of the estate by the executor, he continued the operation of the Bee Hive and the three branch stores, as stated above. There arose litigation concerning the claims of the widow, the testator's second wife. The testator had made a prenuptial agreement with her by which at his death she was to receive $10,000.00 in full settlement of all interest in his estate. After his death she repudiated the agreement and sought to recover her dower interest. A settlement, in compromise, was made with her by which she received $37,500.00 in cash from the executor in full of all demands. She thus passed out of the present litigation, and will not be further considered. It is assumed that that settlement was made with the legal approval of the executor and the heirs-at-law, and that she was paid out of the general assets of the estate, including the $50,000.00 life insurance.

It appears that the two sons, Robert and Duren, the beneficiaries of the third codicil, in reference to the several stocks of goods, offered to accept the terms of the codicil and take them over upon the conditions named. On account of the then pending litigation and the uncertainty in the mind of the executor as to the proper construction of the will, the executor declined to immediately comply with their offer until all matters of the construction of the will had been determined and the litigation ended. He continued to carry on the business as theretofore.

The present proceeding was then instituted in January, 1927. The contentions of the several parties will appear with sufficient clearness in the decrees of his Honor, Judge Sease, and in the discussion of the appeal hereinafter.

The case was referred to the master to take the testimony offered and report it, which was done at a time not stated in the record. The matter then came on to be heard by his Honor, Judge Sease, at a time not stated upon the testimony reported by the master. He filed an elaborate decree dated

September 29, 1928, which will be reported, from which all of the parties have appealed except the executor.

Pending the appeal and before anything was done under the decree of September 29, 1928, to wit, on March 18, 1929, the building occupied by the Bee Hive branch of the business was destroyed by fire, and the stock of goods which included the stocks brought in from the Union and Greer stores, but not from the Landrum store, damaged or destroyed. The estate had at the time insurance upon the building and upon the stock, all of which appears to have been collected by the executor and deposited by him in various banks, amount to $105,700.00 ($58,700.00 of the insurance on the stock of goods, and $47,000.00 on the building), all of which it is supposed will be paid.

I. The plaintiff contends, which is also in the interest of the other children who insist upon the same construction of the will, that, there being no testamentary disposition of the fee in the real estate, the title thereto vested in them as heirs of an intestate estate, and that the direction that it be held in trust for a period of many years, until the youngest child shall have attained the age of forty years, contravenes the rule against perpetuities, and robs the inherited fee-simple estate of the heirs of an essential incident of title.

The property belonged to the testator, and we see no reason why he should not be allowed to dispose of it as he pleased. The limitation was clearly within the rule of perpetuities which permits a limitation within a life or lives in being. The fact that he made no disposition of the fee does not prevent the taking effect of a valid disposition of an estate less than a fee. It would be as tenable a position that a life estate would be void for the reason that the fee had not been disposed of. The conclusions of his Honor, Judge Sease, in his decree of September 29, 1928, upon the point are approved.

II. It seems clear, from the provisions of Item 8 of the original will, that the testator intended and provided that

the executor should use the insurance money, realized from the policy or policies on the store building, supplemented by a sufficient sum from the income of real estate, in rebuilding upon the Bee Hive lot a structure substantially similar to the destroyed building, and adequate to such business as was formerly conducted there. This scheme appears practicable as to all buildings owned by the testator, except the Bee Hive building. As to it the testator's scheme has been completely disrupted by the destruction by fire of the building and practically its entire contents, a contingency which he could not anticipate and did not provide for. His scheme manifestly was that the sons should take over the stocks of goods and continue the operation of the Bee Hive establishment supplemented by the stocks in the branch stores, as he himself had been doing. If as we shall endeavor to show, the sons are not entitled to be made whole out of the assets of the estate for the stock destroyed by fire (they of course giving their obligations therefor), and are unable to stock the building as it had been stocked, it would appear unreasonable to apply such procrustean rule to the executor, requiring him, regardless of changed conditions, to follow the letter of the will. If the sons may satisfy the Court that they are able, from their own resources, to establish such a business as has been destroyed the Circuit Court may, in its discretion, by order direct the executor to reconstruct a suitable building for that purpose. If they may not, the Court may by order direct the executor, upon his application, to make such use of the vacant lot as under the circumstances will comply as near as may be with the intention of the testator "so that my real estate may be kept in an income producing condition."

III. In his decree of November ...., 1929, his Honor, Judge Sease, declared: "It is my opinion that the stock of goods that the testator ordered in the 3d codicil to be sold to these boys, is still in existence but in the form of money realized from insurance thereon, capable of repurchasing a

stock of goods, and that the stock of goods instead of being sold and converted into money has been destroyed by fire and converted into money by reason of the insurance on the stock of goods at the time of the fire." He accordingly ordered that the executor use the $58,100.00 ($58,700.00?) insurance money collected on policies upon the stock of goods destroyed by fire for the repurchase and replacement of similar stock of goods after the new building had been reconstructed and that he sell such goods to J. Duren Collins and Robert E. L. Collins under the terms and conditions of the third codicil of the will.

The situation is abnormal and not free from difficulty. The boys were not legatees of the stocks of goods, but at their option, and subject to the conditions named in the will, they were to become purchasers from the executor, at a price based upon the inventoried cost, less 25 per cent. for depreciation, with the privilege of occupying the building at a low rental. They evidently were expected to give their obligation to the executor for such purchase price, and it was provided that they should "pay on the purchase price of the stock of goods transferred to them, the sum of $300.00 per month until the debt for the stock of merchandise is fully paid."

It appears that they notified the executor, soon after he took possession, that they would accept the proposition contained in the will. It does not appear that they made a formal demand upon the executor for the stock of goods, and to be let into possession of the building. He put them off with the statement that he could not comply with their request on account of pending litigation and doubts as to a proper construction of the will and a resolution of many questions which were arising as to the administration of the estate. The testator died in November, 1925; the executor qualified practically immediately; the fire occurred in March, 1929, three years and four months thereafter; during that period the executor remained in possession of the building and

stock of goods, bringing in the stocks from two of the three branch stores and conducting the business as Collins had done; no disatisfaction on the part of the boys appears to have been indicated; things were allowed to "rock on," until the calamity of fire overtook them.

What rights did the boys acquire under the will? Not a legacy of the stock of goods, but an option to purchase it.

In *Watson v. Riley*, 101 Neb., 511, 164 N. W., 81, 82, it was held: "An option to buy real or personal property at a given price is everywhere recognized as a property right."

In 40 Cyc., 2000, it is said: "An option to purchase property of the estate whether it be at an appraised value or at a price named or agreed upon, may be created by will." To same effect see *Daly v. Daly*, 299 Ill., 268, 132 N. E., 495.

It is regarded as an essential incident to the exercise of such an option that the optionee shall accept the proposition within a reasonable time.

In *Dunne v. Dunne*, 66 Cal., 157, 4 P., 441, 1152, it was held that one entitled to an option under a will, to take property at a certain valuation, must exercise his option within a reasonable time.

In 40 Cyc., 2000, it is said: "This option must be exercised within the time set in the will or within a reasonable time if no time is fixed by the will."

It is possible that under the condition of the estate at that time, the pendency of litigation and the doubt which the executor entertained, as to various matters connected with the administration of the estate, the laches of the boys extending over three years, may be to some extent excusable, but during all of that time the Courts were open to them to force an acceptance by the executor of the exercise of their option, which for some reason they neglected to take advantage of.

Another matter to be considered is the validity of the acceptance which the boys contend that they made to the executor; it is true that they expressed their willingness to

accept the terms of the will and made a request of the executor to close the transaction, but the matter was not pressed, and consummation of it was not had. They had the right to insist upon such consummation, but they did not do so and waited for more than three years until a situation developed which made it impossible for such consummation, the subject of the contemplated sale having been destroyed.

To constitute a valid acceptance of the proposition contained in the will, it was essential that they should do all that was required of them by the terms and conditions of the will; the will evidently contemplated the execution by them of an obligation to pay the purchase price of the stock of goods; they should have presented to the executor such an obligation, and, being for a liquidated sum, it naturally would have borne interest from date. In the case of *Holly Hill Lumber Company v. Bank,* 160 S. C., 431, 158 S. E., 830, heard at the March term of this Court and now in process of decision the authorities in the opinion of Mr. Justice Townsend are very strict as to the necessity of the party claiming an acceptance of tendering what he was under obligation to do.

Assuming that the boys did all that was required of them to consummate the matter, it then became an ordinary executory contract between them and the executor for the sale of the stock to them under the terms and conditions prescribed in the will. Pending a completion of the executory contract, the stock of goods, the subject of the contract, was destroyed by fire, and the question arises upon whom must the loss fail.

In the case of *Good v. Jarrard,* 93 S. C., 229, 76 S. E., 698, 43 L. R. A. (N. S.), 383, a similar question arose in reference to an executory contract for the sale of a house and lot. Before the day set for the completion of the contract arrived, the building was destroyed by fire. In an action by the vendor against the vendee for specific performance of the executory contract, the question arose upon whom should the loss, caused by the destruction of the building,

fall. The case was tried on Circuit by his Honor, Judge Gage, later Associate Justice, who held that the loss should fall upon the vendee. Upon appeal, his decree was reversed, this Court being divided upon the question. The prevailing opinion, holding that the loss must fall upon the vendee, was written by Chief Justice Gary and concurred in by Justices Hydrick and Fraser, Justice Woods writing a dissenting opinion which was concurred in by Justice Watts, later Chief Justice. In view of the divergence of opinion upon the question, the very able dissenting opinion of Justice Woods, and the elaborate array of authorities sustaining the dissent, appearing in a note to *McGinley v. Forrest,* 107 Neb., 309, 186 N. W., 74, 22 A. L. R., 567, the principle announced in *Good v. Jarrard* cannot be said to be firmly established in this State.

Accepting, however, for the time being, the conclusion arrived at in *Good v. Jarrard case,* and particularly in view of the delay caused by the executor in not complying with the request of the boys (see cases cited in note 22 A. L. R. at page 583), the loss must fall upon the estate, which appears to have been protected against by the insurance upon the stock. The legal title to the stock of goods never passed from the executor, and of course he had the right to procure insurance upon it for the benefit of the estate; at the same time the boys had an equitable right to have the contract provided for in the will carried out. It has frequently been held that, under an executory contract of sale, the vendor holds the legal title as trustee for the vendee upon his compliance. The executor therefore received the proceeds of the insurance upon the stock as trustee to protect the vendees from loss by reason of his inability to carry out the contract, unless the delay was caused by the negligence of the vendees. We cannot say that the vendees under the circumstances were guilty of such negligence as would bar their rights; and the question would arise, assuming as has been said, that their acceptance was valid, as to the measure of their dam-

ages in losing the opportunity, presented to them by the will, of purchasing the stocks of goods. The property was not bequeathed to them; they had simply an option to buy it at an ascertainable price, on time; the damage sustained was the difference between the actual value of the property and the price at which they could have acquired it; what they may have in conducting the business would be too speculative for a basis.

We do not think that the evidence is sufficiently adequate to decide the issues whether the vendees have accepted the option tendered in the will; whether the executor is chargeable with the delay, in consummating the transaction; whether the vendees have been negligent in not acting within a reasonable time to enforce compliance by the executor; and the amount of damages to which the vendees would be entitled, if entitled thereto; and that the case should be referred to a special referee to take the testimony and report his conclusions of law and fact upon these issues.

IV. As above recited, the widow repudiated the antenuptial agreement by which she was to receive, at the death of the testator, $10,000.00 in full satisfaction of all claims against the estate; she refused to accept the money, and set up a claim of dower in all the real estate of the testator. Her claim was compromised for $37,500.00 in cash; it represented her claim to dower. The amount in compromise was paid by the executor out of the $50,000.00 life insurance, it appears with the approval of all parties concerned, whether under an order of Court or not does not appear.

It is contended that the $37,500.00 paid to Mrs. Collins should not have been paid out of the life insurance money, for two reasons: That the insurance money was personal property, and came within the provisions of Item 2, Subdivision A, of the original will; and that so much of it as represented her dower interest should be charged to the real estate.

The subdivision referred to provides: "I direct that my said executor shall with all reasonable diligence and dispatch, after my death, proceed to sell and dispose of all my personal property, collect all the debts and choses in action due to me and convert the same into money" which he was directed to invest and dispose of under Subdivision B. There appears no doubt but that the life insurance money was not only personal property, but that it was the proceeds of a collection of a debt or chose in action which was due to the estate of the testator at his death, and should have become a part of the fund referred to in Subdivision A and disposed of under Subdivision B.

It is suggested that at least $10,000.00 of the $37,500.00 paid to the widow in compromise was a debt of the testator and payable out of the life insurance money. This cannot be, for the reason that the widow repudiated the antenuptial agreement which provided for the payment of $10,000.00 in full of her interest in the estate, and the parties practically confirmed that repudiation by paying her more than three times that amount upon her claim of dower; the $37,500.00 therefore did not include the unrecognized debt of $10,000-.00; it could not have covered any interest in the estate real or personal as an heir-at-law, for the reason that the claim of dower excluded any claim as heir-at-law; it was a settlement of the dower claim alone, and necessarily became a charge upon the real estate, practically an assignment of it. The parties interested having approved the compromise, however, are bound to reimburse the executor for the amount. It being impossible under the terms of the will to reimburse the executor out of the real estate which is not to be sold until the youngest child comes of age, the only fund out of which the executor may be reimbursed is the profits from the operation of the business by the executor up to the time of the fire, which amounted to the rise of $90,000.00. It does not distinctly appear that the executor has this fund actually on hand. At any rate, he should be allowed credit in his acounting for the $37,500.00.

V. The amount paid by the executor on account of the Federal and State inheritance tax was a debt of the estate, and was properly paid out of the life insurance money, under Item 1 of the will, directing the payment of debts "out of the first moneys coming into his hands from my estate." The same may be said of the funeral expenses, including cost of monument.

VI. The executor is authorized to use the proceeds of the insurance upon the building in carrying out the directions contained in Subdivision II of this opinion. Any surplus thereof remaining should be considered as income from real estate, and fall within the provisions of Item 5 of the original will.

VII. The surplus which may remain of the proceeds of the insurance upon the stock of goods, after complying with the directions contained in Subdivision III of this opinion shall be considered as personal property, and fall within the provisions of Item 2, Subdivisions A and B.

VIII. The conclusions of his Honor, Judge Sease, in his decrees of September 29, 1928, and November ...., 1929, not affected by the conclusions herein announced and consistent therewith are affirmed.

The judgment of this Court should be that the decrees appealed from be modified as herein indicated, and that the case be remanded to the Circuit Court for further proceedings consistent herewith.