MONTGOMERY WARD & CO., Incorporated, Appellant,

v.

COLLINS ESTATE, INC., Appellee.

No. 7769.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 7, 1959.

Decided June 19, 1959.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and BOREMAN, District Judge.

BOREMAN, District Judge.

This action, commenced in 1941, involves the construction of a lease of store premises in Spartanburg, South Carolina, between the heirs of J. D. Collins, deceased, as landlords, and Montgomery Ward & Co., Incorporated, hereinafter referred to as Ward, as tenant. The original action was instituted by Ward to foreclose a mortgage. The answer of the defendant, Collins Estate, sought a construction of the lease and an accounting of all rents due thereunder. The original prayer for foreclosure of the mortgage was voluntarily dismissed but the District Court retained jurisdiction of the controversy and, on September 3, 1958, after seventeen years of litigation and consideration, rendered a final judgment in favor of the landlord on its claim for an accounting in the amount of $209,473.04, with interest at six per centum per annum from March 1, 1957. Many unexplained delays, for protracted periods, occurred intermittently during the seventeen years.

Ward first contends that when it voluntarily dismissed its foreclosure action, the District Court should have dismissed the claims of the Collins Estate. During the protracted period of litigation, the case has twice been referred to a master for the purpose of making detailed findings, and all of these extensive and expensive proceedings have been primarily devoted to consideration of the merits of the estate's claim for an accounting and a construction of the lease. The claim for an accounting, actually in the nature of a counterclaim, whether it be considered compulsory or merely permissive, does possess its own basis for federal jurisdiction. We, therefore, perceive no error in the trial court's retention of jurisdiction of the case in order to dispose of the estate's claims. See Switzer Brothers, Inc. v. Chicago Cardboard Co., 7 Cir., 1958, 252

David L. Dickson, Asst. General Counsel, Chicago, Ill., Montgomery Ward & Company (T. Sam Means, Jr., Spartanburg, S. C., on brief), for appellant.

Alfred F. Burgess, Greenville, S. C., and J. Hertz Brown, Spartanburg, S. C. (Carlisle, Brown & Carlisle, Spartanburg, S. C., and Wyche, Burgess & Wyche, Greenville, S. C., on brief), for appellee.

F.2d 407; Isenberg v. Biddle, 1941, 75 U.S.App.D.C. 100, 125 F.2d 741.

The other primary questions presented for determination relate to alleged errors of the trial court in interpreting certain provisions of the lease pertaining to payment by the tenant of "percentage rent" and amounts which Ward is entitled to withhold therefrom for application to the payment of certain costs, expenses, etc. The lease, dated January 31, 1935, consists of twenty-six paragraphs and, for the sake of brevity and clarity, reference will be made only to the particular provisions to be considered in determining the questions raised on this appeal.

In construing and interpreting the lease and as an aid in determining the intention of the parties, it is first necessary to review the situation of the parties to the lease and the background facts and circumstances existing during the negotiations leading to the execution of the lease agreement.

The property here involved was formerly a part of the estate of J. D. Collins, who, prior to his death in 1925, had operated a retail store thereon. In March 1929, the store was destroyed by fire and the insurance proceeds were subsequently lost in bank failures. The facts with respect to these matters are more fully detailed in Davenport v. Collins, 1931, 161 S.C. 387, 159 S.E. 787. The property remained vacant and unimproved for a number of years. At the time the lease in question was executed, the Collins heirs and estate were without funds, the property was heavily encumbered by delinquent tax liens and judgment liens and ownership of the property was divided among twelve children of J. D. Collins. The execution of the lease was approved by the state court on behalf of one of the Collins children who was a minor, one who was incompetent, and one who was in receivership, in a proceeding for that purpose. Subsequently, in April 1935, another action was instituted in the state court for partition in kind of all the real estate owned by the Collins heirs, including the leased premises. This proceeding resulted in an allotment of the leased premises and certain other property in Spartanburg to six of the Collins children. It is conceded that they were financially unable to construct a building on the premises. This property was then transferred to a newly formed corporation known as The Collins Estate, Incorporated, the appellee herein and hereinafter referred to as Estate, the stock of which was owned by the six children to whom the leased premises had been allotted. This corporation was chartered on June 8, 1935, and thereafter functioned as lessor or landlord. Ward, as ultimate tenant under the lease, was very much interested in constructing and operating, undisturbed, a retail store at what was apparently considered a favorable business location. Ward was financially able to provide the funds in substantial amount to construct the building.

In effect, under the provisions of paragraph 6 of the lease, the Estate agreed to attempt to obtain a loan, secured by a first mortgage on the demised premises, in a principal amount not exceeding $76,000 at an annual interest rate not exceeding $5\frac{1}{2}\%$. Proceeds from said loan were to be used for the construction, on the demised lands, of a store building suitable for the conduct of Ward's business, it being the intention of the parties that the building would be the property of the Estate, although Ward was to assume the responsibility for, and initial expense of, constructing the building. The loan proceeds were to be turned over to Ward upon the completion of the building as reimbursement for the construction expense. The mortgage indebtedness was to be paid to the mortgagee on behalf of the Estate by Ward by means of a "fixed rent", provision for which was made in paragraph 2 of the lease. The fixed rent payments were to be made by Ward directly to the mortgagee at an annual rate equal to an amount sufficient to amortize the mortgage indebtedness over a period of twenty years, the original term of the lease. It is further provided in paragraph 2 that the fixed rent

payments were to be made monthly, semiannually, or annually, at the election of the mortgagee.

In addition to the fixed rent, Ward agreed, in paragraph 3 of the lease, to pay a "percentage rent". This percentage rent was stipulated as an amount equal to three per cent of the gross retail sales (less exchanges, allowances, etc.) made by Ward on the premises during each year in excess of an "annual basic sales total" equal to the product of 33⅓ times the annual fixed rental. The percentage rent was to be paid by Ward to the Estate for each lease year. In other words, if Ward's gross retail sales for any lease year should not equal at least the "annual basic sales total", the Estate would receive no percentage rent for that year; but if the gross retail sales *exceeded* the "annual basic sales total", the percentage rent would be an amount equal to three per cent of such excess.

Pursuant to the provisions of paragraph 6, the Estate negotiated a first mortgage loan in the amount of $76,000 from the Pilot Life Insurance Company on August 12, 1935. Ward thereupon proceeded to construct the new store building and opened operations therein on April 16, 1936. The total cost of the building was $88,688.09 and Ward was reimbursed from the proceeds of the mortgage loan to the extent of $76,000. Thus there was an excess building cost to Ward of $12,688.09.

█ The first question involving the construction of the lease arises by virtue of the holding of the trial court that percentage rent was payable, under the terms of the lease, semiannually rather than annually, whereas Ward has been making payment of percentage rent on an annual basis. There is no express provision in the lease from which the answer to this question may be found. The Pilot Life Insurance Company, mortgagee, had elected, under the terms of paragraph 2, previously mentioned, to receive the "fixed rent" semiannually. The trial court concluded, mainly on the basis of an assumed relationship of the fixed rent to the percentage rent, that it was

the intention of the parties that the two types of rent should be paid in the same manner. Also, the trial court placed some emphasis on the use in paragraph 3 of the lease, dealing with percentage rent, of the word "period" rather than "year", as indicating that the parties intended the payments to be made at intervals of less than a year. We reach the conclusion that the only connection between the fixed rent and the percentage rent is that the amount of *"annual* fixed rent" enters into the computation of the percentage rent to be paid "for each such lease *year"*. (Emphasis supplied.) Although no time is fixed, the general tenor of paragraph 3 clearly shows, in our opinion, that, in the absence of some contrary subsequent arrangement, the payments of percentage rent were to be made annually. The logic of this conclusion finds support in the provision in the lease itself to the effect that the amount of the percentage rent was to be determined by the amount of sales made "during each lease year" and was to be paid "for each such lease year". The only relation between fixed rent and percentage rent is that the amount of the annual fixed rent entered into the determination of the "annual basic sales total". As hereinbefore explained, unless and until the "annual basic sales total" is reached in any lease year, no percentage rent will be payable, and the computation of the amount of percentage rent itself is wholly independent of the computation of the "annual basic sales total". Moreover, although fixed rent is payable semiannually, only by reason of the mortgagee's election, it is to be computed at an *annual rate.* Furthermore, there is a provision in the lease that the basic sales total shall be prorated if percentage rent is payable for a period of less than a year, and this provision clearly indicates that payment for a period of less than one year is only a possibility, not a requirement. In view of the fact that the percentage rent is to be computed on an annual basis and perceiving no valid reason for requiring payment at intervals shorter than a year, the more logical interpretation appears to be that the payments of per-

centage rent were intended to be made annually. Any other construction would place undue strain on the language of the lease provisions.

■ The next question arises in connection with the provisions in the lease for deductions or amounts to be withheld by Ward from percentage rent payments. In this connection, and in construing what may appear to be inconsistent and irreconcilable terms and provisions as contained in different paragraphs, we cannot lose sight of the basic provisions concerning the payment of percentage rent, over and above the fixed rent. The formula by which the amount of percentage rent is determined is clearly set forth. Since the obligation to pay percentage rent is contingent upon the volume of sales, it must be assumed that the parties recognized the possibility that *no* percentage rent would ever be due and payable, and it must be further assumed that the parties were making provision for the payments of taxes, insurance costs, etc., in the event such payments could not be made from earned percentage rent. Our construction is premised upon the following conclusions: If percentage rent should be earned and available for such purposes, payments of certain costs and expenses should be made therefrom and charged to the account of the Estate; if there should be no earned percentage rent, Ward assumed the liability for such payments on its own account, without prospect of reimbursement.

Paragraph 4 provides:

"4. It is understood and agreed that anything in this lease to the contrary notwithstanding, the tenant may withhold and deduct from any percentage rent earned or payable hereunder, * * * any amounts paid by it on account of the following items:

"(1) All real estate taxes and special assessments that may be assessed against the demised premises.

"(2) The cost of all insurance coverage furnished by the tenant computed on the basis of standard board rates.

\* \* \* \* \* \*

"(4) Any amount paid by the tenant on account of the cost of the new building to be erected on the premises in excess of the principal amount of any first mortgage indebtedness which may be placed on the premises in accordance with the provisions of paragraph six of this lease."

Ward has deducted from percentage rent payments all real estate taxes assessed against the leased premises during each lease year. In doing so, Ward has relied on the terms of paragraph 4(1) as quoted above. In connection with the question as to the payment of real estate taxes, paragraph 5 provides:

"5. The tenant shall pay all real estate taxes which may be levied or assessed against the demised premises and the improvements thereon or any part thereof for each year of the term of this lease commencing with the taxes levied for the year in which this lease begins, except that the tenant shall pay only its pro rata share of said taxes levied or assessed for the years in which this lease begins and ends, \* \* \*."

The District Court, in interpreting and construing the provisions of paragraphs 4(1) and 5 so as to give effect to both, held that Ward could deduct from percentage rent only those taxes paid by it for periods before and after the fixed term of the lease. Ward contends that it is entitled to deduct, as it has done, all amounts paid by it for real estate taxes on the demised premises. As to this contention, the District Court said, "If paragraph 4 of the lease is read as tenant contends it should be read, then paragraph 5 must be regarded as meaningless". This would appear to us to be a strained interpretation adopted by the trial court. To support such an interpretation, it would be necessary to resort to technical and unwarranted grammatical distinctions. In our

opinion, these two provisions are not in conflict but are completely harmonious. The language used quite clearly indicates the intent that Ward is to *pay* the taxes assessed against the leased premises, but that it is entitled to reimbursement from the Estate by way of deductions from percentage rent. Such an interpretation is consistent with the other terms of the lease and gives full effect to both paragraphs. Significant of intent is the fact that the premises, both land and building, belonged entirely to the Estate. Ward apparently desired to be protected from any possibility that its possession under the lease might be interrupted because of the failure of the Estate to pay the real estate taxes, and the background facts clearly indicate that the Estate was without funds at the time the lease was executed. On the other hand, Ward possessed the means with which to insure the proper and timely payment of the taxes.

 The next issue involves the deductibility of insurance costs from percentage rent. Throughout most of the lease term, Ward has carried both fire and extended coverage insurance on the leased premises, and has deducted from percentage rent the cost thereof at "board rates" for each lease year. In spite of the provision in paragraph 4(2) quoted above to the effect that, anything in the lease to the contrary notwithstanding, the tenant is entitled to deduct from earned percentage rent "the cost of all insurance coverage furnished by the tenant computed on the basis of standard board rates", the trial court held that Ward had improperly deducted and withheld these insurance costs. The basis for this holding was that paragraph 11(b) limits the application of paragraph 4(2). Paragraph 11(b) reads as follows:

"11 b. The tenant covenants and agrees that it, the tenant, will at all times and at its own expense keep any and all buildings or improvements hereafter constructed or placed upon said premises by it, insured against loss or damage by fire in an amount equal to eighty per cent. (80%) of the full insurable value thereof above the foundation walls. * * *."

In the opinion of this court, the same construction and reasoning with regard to the deduction of taxes from earned percentage rent are equally applicable to the provisions respecting the payment of insurance costs. In paragraph 11(b), Ward has specifically agreed to keep the premises insured against fire, but by virtue of paragraph 4(2) it is provided that Ward shall be entitled to withhold, from percentage rent, *all* insurance costs computed at standard board rates. We do not construe the words, "at its own expense", as indicating a contrary intent, or as creating a conflict with or limitation of paragraph 4(2). Under our interpretation of the language of the lease provisions, the two paragraphs are not inconsistent. However, even if we were to find it impossible to reconcile the provisions of the two paragraphs, the clear language and apparent intent of paragraph 4(2) must prevail in view of the language therein: "anything in this lease to the contrary notwithstanding". Cf. Owen v. Bankers' Life Ins. Co., 1909, 84 S.C. 253, 66 S.E. 290. The additional contention by the Estate that the failure of Ward to show the *actual* cost of the insurance carried and how it was allocated would preclude the allowance of the deduction is equally without merit. The lease clearly provides in paragraph 4(2) that the insurance cost is deductible on the basis of standard board rates. The standard board rate for the "insurance coverage furnished by the tenant", Ward, is certainly a definitely ascertainable amount. We therefore hold that Ward is entitled to a deduction from earned percentage rent of the cost of all insurance furnished by Ward on the basis of standard board rates.

 The next question for consideration is whether it was proper for Ward to deduct from percentage rent payments the entire amount of excess building costs. The portions of the lease pertinent to this matter are paragraph 4(4),

set out above, and paragraph 8 which provides as follows:

"8. Upon the completion of said new building, the entire property with improvements and appurtenances thereon will be and remain the property of the landlords, subject to this lease, and the tenant shall have no other right or title thereto, except that the tenant shall have a valid and continuing lien, subordinate only to the lien of said first mortgage referred to in paragraph six hereof, on the entire demised premises and all improvements thereon during the term hereof to secure the total amounts advanced by the tenant to the landlords, in accordance with this lease, and *any other amounts expended by the tenant on account of the cost of said new building in excess of the principal amount of any first mortgage loan placed upon the demised premises in accordance with the provisions of paragraph six hereof,* and thereafter paid to the tenant.

" * * *. In order to secure the tenant for all such advancements to the landlords, and *any other payments made by the tenant which are to be repaid by the landlords,* the landlords shall execute and deliver to the tenant a promissory note evidencing such *total indebtedness,* plus interest at the rate of five and one-half (5½%) per cent, per annum, all payable as provided in paragraph four of this lease. Said promissory note shall be secured by two mortgage indentures to be executed by the landlords, one of said mortgages shall cover the entire demised premises and shall be subordinate in lien only to the first mortgage hereinbefore referred to, and the other mortgage indenture shall be a first mortgage and shall cover the following described property:

\* \* \* \* \* \*

or any other property \* \* \*." (Emphasis supplied.)

It is clear from paragraph 8, read in conjunction with paragraph 4(4), that the parties contemplated the possibility that the new building, when completed, might cost more than the amount of the first mortgage loan, and that they, therefore, provided that the ultimate liability for any such excess costs would be with the Estate. However, at the time the lease was executed, it was not definitely known that there would be excess building costs nor, if any such costs, what they would be. It seems quite logical to assume that the parties may have intended to agree at some later time on the amount of excess building costs for which the Estate would assume responsibility. On August 12, 1935, the two mortgages mentioned in paragraph 8 of the lease were executed. Each such mortgage contains the following recital:

" * * * in order to secure the payment unto said Montgomery Ward & Co., Incorporated, of the difference between $76,000.00, and the sum or sums expended or paid by said Montgomery Ward & Co., Incorporated, in the erection of a building upon the premises embraced within the said lease \* \*, in accordance with the terms of said lease, *such sum so secured not to exceed $7,500.00,* and to be represented by a note to be hereafter executed pursuant to the terms and provisions of said lease, \* \* \*." (Emphasis supplied.)

It is clear to us, as it was to the District Court, that after the obligation to pay excess building costs was assumed by the original lessors and subsequently by the Estate, it was agreed that such excess building costs for which the lessors would be obligated should not exceed $7,500, and that when the exact amount of excess costs was ascertained, the lessors would execute a note for that amount but not in excess of $7,500. If such was not the intention of the mortgage recitals quoted above, there could be no logical explanation for the insertion in the mortgages of the emphasized phrase. We cannot be persuaded that

the original lessors and the Estate, which were admittedly in poor financial condition, would have entered into such a contract assuming liability for an obligation in an unascertained amount and subject to the whim of Ward as to adding to the original plans and specifications. A further indication of the intent of the parties as to excess building costs is the provision in paragraph 8 of the lease to the effect that "the landlords shall execute and deliver to the tenant a promissory not evidencing such total indebtedness", and that "said promissory note shall be secured by two mortgage indentures to be executed by the landlords". The two mortgages executed on August 12, 1935, containing the above quoted recital, were obviously the indentures contemplated in paragraph 8 and, according to that paragraph, the note secured by these mortgages was to represent the *total* indebtedness as to excess building costs. The mortgage recital provides that "such sum" (referring to excess building costs) was not to exceed $7,500, and that "such sum", which was not to exceed $7,500, was to be represented by a note. Since this note was, by the terms of paragraph 8, to evidence the *total indebtedness* for excess building costs, and since the note, as later mentioned in the mortgage recital, was to represent a sum not to exceed $7,500, it is logical to conclude that the intention was to limit the excess building costs for which the mortgagors were to be responsible to the sum of $7,500.

■ Ward has also taken deductions from percentage rent for attorneys' fees paid by Ward to its attorneys in the amount of $12,748.96 and claims a right to have done so pursuant to the provisions of paragraphs 6, 16, and 20 of the lease agreement. The trial court limited such deductions to $1,736.62. For such fees to be deductible under paragraph 6, they must have been incidental to the making of the first mortgage loan from Pilot Life Insurance Company. To be deductible under paragraph 16, the charges must have been necessary in connection with the removal of any liens, encumbrances or restrictions against the demised premises. To be deductible under paragraph 20, the fees must have been attributable to obtaining an abstract or other evidence of title because of the failure of the landowners to furnish such, or to acquiring, discharging, satisfying or performing some lien, encumbrance, or covenant which might threaten Ward's possession of the demised premises. The interpretation to be placed on these provisions of the lease is not in issue. The question as to the deductibility of portions of the legal fees from percentage rent is purely a question of fact. The master to which the case was referred and the trial court have sifted the nature of the items of legal fees based upon voluminous testimony and documentary evidence. We have considered each item involved in this contention on appeal and hold that the findings of the trial court, in this particular, are not so clearly erroneous that they will be disturbed on appeal. See Faulkner v. Gibbs, 1949, 338 U.S. 267, 70 S.Ct. 25, 94 L.Ed. 62; Suburban Improvement Co. v. Scott Lumber Co., 4 Cir., 1933, 67 F.2d 335, 90 A.L.R. 330; Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. Obviously, the greater portion of the legal work was performed primarily because of Ward's desire to obtain the lease on these very desirable premises and to insure undisturbed possession.

■■ In the judgment rendered below, the trial court included, in the amount of awarded damages, interest "at the legal rate of 6% on all indebtedness which may be found due landlord, if any, from the respective dates that such indebtedness became payable". The allowance of interest as compensatory damages, calculated from the time the money due should have been paid until the time of the judgment, is a well recognized procedure. See E. I. DuPont De Nemours & Co. v. Lyles & Lang Constr. Co., 4 Cir., 1955, 219 F.2d 328; Chesapeake & Ohio Ry. Co. v. Elk Refining Co., 4 Cir., 1950, 186 F.2d 30, 36 A.L.R.2d 329. See also 15 Am.Jur., Damages, §

159 et seq. (1938), and we think that South Carolina follows this general rule. Anderson v. Purvis, 1951, 220 S.C. 259, 67 S.E.2d 80; Leaphart v. National Sur. Co., 1932, 167 S.C. 327, 166 S.E. 415; Columbia Lumber & Mfg. Co. v. Globe Indem. Co., 1932, 166 S.C. 408, 164 S.E. 916. See also Epworth Orphanage v. Long, 1945, 207 S.C. 384, 36 S.E.2d 37. However, it is our opinion that the Estate is entitled to such rate of interest as will compensate it for the delay in recovering damages when consideration is given to the state of the money market during the years for which interest is allowed, and considering also the delays in prosecuting this litigation to a conclusion, not all of which can be attributed to Ward. It is our opinion that, under the circumstances here, the Estate will be well compensated by an award at the annual rate of three per cent (3%) from the respective dates that such indebtedness as is determined to exist became payable and up to the time of judgment. See E. I. DuPont De Nemours & Co. v. Lyles & Lang Constr. Co., supra; Chesapeake & Ohio Ry. Co. v. Elk Refining Co., supra.

■ Ward further complains that the master, in stating the account, applied Ward's past payments of percentage rent, first to the interest allowed as damages rather than first to rent due at the times of payment. We are of the opinion that Ward's contention is correct. See [Attorney General of] Massachusetts v. Western Union Telegraph Co., 1891, 141 U.S. 40, 11 S.Ct. 889, 35 L.Ed. 628. Since the interest awarded as damages is to recompense the prevailing party for the loss of use of the money wrongfully withheld, each payment should, in equity, be credited against the principal and interest due at the time of such payment. In other words, Ward was entitled to the benefit of the amounts paid as of the time they were paid.

The case will be remanded for further proceedings not inconsistent with the views expressed herein.

Affirmed in part, reversed in part, and remanded.