15781

EPWORTH ORPHANAGE *ET AL.* v. LONG *ET AL.*

(36 S. E. (2d), 37)

*Messrs. DuRant, DuRant & Plowden,* of Manning, and *Carlisle Roberts,* of Columbia, Counsel for appellants,

*Messrs. W. Brantley Harvey* and *William N. Levin,* both of Beaufort, Counsel for the Respondent Executors,

*Mr. Randolph Murdaugh,* of Hampton, Counsel for the Respondent Bank,

November 17, 1945.

Mr. Associate Justice Oxner delivered the unamious Opinion of the Court.

George Holmes, a resident of Beaufort, S. C., died testate in 1919. In Item 8 of his will he directed his executors and executrix, after payment of his debts, expenses of the estate and numerous legacies previously specified, "to set aside the sum of $61,000.00 to be invested by them as they deem best, said amount ($61,000.00) to be held in trust by them and the income from same to be paid" to his widow, Julia E. Holmes, during her life and upon her death, to distribute the corpus as follows: $10,000.00 to the trustees of the Methodist Episcopal Church, South, to be expended by them "for the support, maintenance and benefit of the superannuated members of the Southern District of South Carolina Conference"; $1,000.00 to the Benevolent Society of the City of Beaufort to be used "for benevolent purposes"; and $50,-000.00 to the board of trustees of the Epworth Orphanage of Columbia, S. C., "to be used for the benefit and use of said orphanage". The testator appointed his widow, Julia E. Holmes, as executrix and R. A. Long and W. F. Marscher as executors of his will, all of whom duly qualified and entered upon the discharge of their duties.

The testator had, at the time of his death, on deposit in the Peoples Bank of Beaufort more than $61,000.00. On November 11, 1919, shortly after they qualified, the executors and executrix, in accordance with the terms of Item 8 of the will, set aside $61,000.00 by transferring that amount to the credit of the estate in the savings department of said bank. In 1920, $17,000.00 was withdrawn and placed in the savings departments of two other banks, leaving a balance of $44,000.00 to the credit of the trust account in the Peoples Bank of Beaufort. The Peoples Bank became financially embarrassed prior to July 1, 1932. On or about that time, in an effort to rehabilitate the bank, an attempt was made to reorganize. In 1935, the bank being unable to comply with

the terms of the 1932 plan of reorganization, a further reorganization was undertaken. The terms of these alleged reorganization plans will be hereinafter discussed in detail, as well as the attack made on their validity. Only a brief reference will now be made to the result. The old depositors have been paid by the bank 28% of their deposits. Under the terms of these plans of reorganization, it was sought to ·release the bank. from any further liability and the depositors were given for the balance of their deposits participation certificates in certain assets which were withdrawn from the bank and transferred to a trustee.

One of the executors, W. F. Marscher, died in 1931. Julia E. Holmes, the executrix and life beneficiary of the trust, died in October, 1938, leaving of force and effect a will wherein R. A. Long and L. A. Hall were named as executors, both of whom duly qualified and entered upon the discharge of their duties. The income from the trust was paid to Mrs. Holmes as long as she lived.

This action was commenced in October, 1939, by Epworth Orphanage and the board of trustees of the Methodist Church, South, to whom almost all of the corpus of the trust was to be paid upon the death of Mrs. Holmes, against R. A. Long, individually and as sole surviving executor of the estate of George Holmes, and the executors of the will of Julia E. Holmes, deceased, for an accounting. The Peoples Bank of Beaufort was also joined as a defendant on the theory, as alleged in the complaint, that certain funds belonging to the trust were on deposit in said bank and that the bank "wrongfully refuses to recognize its liability on account of said deposits". The bank demurred to the complaint on the grounds that it was improperly joined and that the complaint failed to state a cause of action against it. The lower Court sustained the demurrer, but this order was reversed on appeal to this Court and it was held that the bank was "a 'proper party defendant.' " 199 S. C., 385, 19 S. E.

(2d), 481. The Benevolent Society of the City of Beaufort, to whom a small portion of the corpus of the trust was given, was also joined as a defendant, but no relief was sought against it. The Society defaulted, but answers were duly filed by all the other defendants. The issues were referred to a referee under general order of reference who, after taking the testimony, filed a report on May 17, 1943, in which he found that the executors and executrix of the will of George Holmes were not negligent in the administration of the estate and had properly accounted for all funds coming into their hands, and recommended that additional testimony be taken on certain questions relating to the liability of the bank. On exceptions by the plaintiffs to the report of the referee, the matter was heard by Judge Johnson, who filed a decree on December 8, 1943, wherein the report of the referee was confirmed with reference to the accounting of the executors and executrix of the estate of George Holmes and the account dismissed as to them. He further ordered that the question of the liability, if any, of the bank be reserved and recommitted the case to another referee to take additional testimony on certain issues relating to its liability. After this additional testimony was taken, the matter again came before Judge Johnson, who filed a decree on March 17, 1945, holding that there was no liability on the part of the bank and dismissing the action as to it. The plaintiffs duly appealed from both of these decrees. The two appeals were consolidated for oral argument and will be disposed of in one opinion.

The sum of $17,000.00, which was withdrawn from the Peoples Bank and deposited in other banks, has been duly paid over to the beneficiaries of the trust and is not in controversy. Long, as surviving executor, has also paid to the beneficiaries the sum of $12,379.89, representing a 28% dividend paid by the Peoples Bank to all depositors, and the further sum of $1,835.68 which he claims represents two

5% dividends paid on the participation certificates held by him in the assets transferred from the bank. In other words, there has been paid to the beneficiaries an aggregate amount of approximately $31,000.00, leaving approximately $30,-000.00 of the original trust fund of $61,000.00 which has not been distributed. The surviving executor of the estate of George Holmes and the executors of the estate of Julia E. Holmes contend that this unpaid portion was lost by reason of the inability of the Peoples Bank to pay its depositors in full; that the executors and executrix were not negligent in depositing and leaving on deposit the trust funds in said bank; and that the loss sustained by reason of the reorganization of the bank constituted a legal reduction in the trust fund. Appellants contend that the trustees were negligent in allowing said trust funds to remain on deposit in said bank when they knew, or should have known in the exercise of ordinary care, that the bank was in an unsound and weakened condition and, therefore, the trustees should be held personally liable for any resulting loss. Appellants further contend that the purported reorganizations of the bank were not made in accordance with statutory requirements and, therefore, were not binding on nonassenting depositors, resulting in a continuing liability on the part of the bank for the full amount of the unpaid portion of the deposit. All of these questions were determined adversely to the appellants in the lower Court.

In order to determine the issues raised by the exceptions, it will be necessary to review the history and financial condition of the Peoples Bank during the period when these trust funds remained on deposit and also to determine the validity and. effect of the purported reorganization of the bank in 1932 and again in 1935.

The Peoples Bank of Beaufort was capitalized at $50,-000.00. Respondent Long was one of the largest stockholders, owning one-tenth the total capital stock, and he was

also a director of the bank until March 21, 1919, when he moved to Atlanta, Ga., Another of the executors of the will of George Holmes, W. F. Marscher, owned stock in the bank and was vice-president and cashier until his death in 1931. The only other banking institution in Beaufort, the Beaufort Bank, failed in 1926.

As early as 1925 the loans of the Peoples Bank of Beaufort were not in a satisfactory condition. The bank examiner's report of October, 1925, shows that notes amounting to $27,225.00 were in the hands of attorneys for collection. In November, 1925, the "Finance Corporation" was organized and certain doubtful or worthless assets transferred to this corporation and its stock carried as an asset of the bank. The financial condition of this bank grew progressively worse as shown by the following comments taken from the reports of the bank examiner: November, 1926—"This bank is carrying quite large excessive loans * * * will eventually suffer losses of considerable amount."; April, 1928—"A large amount of very slow loans secured by real estate is being carried, some on which interest has not been collected for several years and examiner is of the opinion that there will be further losses in the final liquidation of this paper."; March 1, 1929—"This bank's condition is very unsatisfactory, and its capital is seriously impaired; some immediate action should be taken by board of directors to restore the impairment. Seventy per cent of the bank's loans are well frozen, past due, and taxes and various installments of prior liens are now being paid by bank and carried as 'Other Resources'. * * * All real estate is now carried far in excess of its true value * * * the borrowers of money seem to have lost respect for their obligations and their ability to pay appears impossible. * * * Impairment of capital $44,270.99." (Long was a director when this report was made and resigned as director about three weeks later); August, 1929—"This bank's general condition is

very unsatisfactory and a serious impairment of capital is shown * * * Examiners recommend that * * * directors formulate a plan for an aggressive liquidation of these frozen loans and make arrangements to restore the exhausted portion of the capital. Unless this is done some action will be taken by the examiner".

The deposits shrunk from $1,368,278.25 in 1927 to $838,127.57 in 1929. The financial statements of the bank were regularly published in the local paper at Beaufort. In 1930 the "Realty Corporation" was formed, the stock of which was owned by the bank, for the purpose of holding title to real estate which the bank acquired in foreclosure proceedings, so as to obviate the necessity of carrying on its books any excessive amount of real estate. In October, 1930, the "Capital Management Corporation" was organized. A special meeting of the stockholders of the bank was held in December, 1930. The necessity of repairing losses sustained by the bank amounting to more than $60,000.00 was discussed. At this meeting each stockholder was assessed in an amount equal to the par value of the stock held by him, but was given the option, in lieu of paying said assessment in cash, to transfer the stock so owned to the Capital Management Corporation upon purchasing an equal number of shares of preferred stock of the same par value in the newly formed corporation, in consideration of which said corporation was to make good the losses of the bank in proportion to the amount of stock so transferred. For some reason not disclosed by the record this proposal was never carried out and no new capital was furnished. The stockholders have never paid any assessment.

On July 21, 1932, the Mayor of Beaufort issued a proclamation closing all business establishments in the town, with certain exceptions not material to this discussion, from July 22nd to July 27th, inclusive. The bank was closed during this period. Apparently the purpose of this proclamation was

to allow time for the bank and the depositors to work out some reorganization plan. During this period more than 80% in number and amount of depositors over $10.00 agreed for the bank to charge off 30% of their deposits and to defer payment of the remaining 70% until July 1, 1935. They also agreed that doubtful or slow assets of the bank equal in amount to the total deposits charged off, plus the surplus and undivided profits, should be transferred to the Peoples Holding Company, a corporation to be organized by the depositors for that purpose, which was to hold said assets in trust and liquidate same as speedily as possible for the benefit of the depositors, to whom would be issued certificates of indebtedness or debentures for the respective amounts of their deposits. The agreement did not apply to secured deposits, nor to future deposits which were to be received by the bank without restriction.

The bank reopened for business on July 28, 1932. The board of directors met three days later and adopted a resolution to the effect that, for the protection of the depositors, the bank should be placed in the hands of the State Bank Examiner for such period of time as may be necessary in order for him to pass upon the depositors' agreement. On August 1, 1932, the attorneys for the bank suggested to the State Bank Examiner by letter that he had authority to direct the reopening of the bank under Section 1-A of Act No. 649 of the Acts of 1932, 37 St. at Large, page 1183. On the same day the Bank Examiner by letter authorized the board of directors to reopen the bank and' operate it as a going institution under the authority of said Section 1-A.

It is doubtful that the Bank Examiner ever actually took charge of the bank in this proceeding. On August 4, 1932, he stated in a letter to one of the depositors that the bank "never, in effect, closed its doors but the moratorium was granted for the purpose of securing the signatures to the petition (of depositors) in order that the bank might con-

tinue to function". On August 15, 1932, in reply to a letter by a depositor complaining that the depositors would lose 30% of their deposits under the reorganization plan while the stockholders had not paid the stockholders' assessment, the Bank Examiner stated that "the 100% liability stockholders' assessment will be assessed through the holding corporation". However, no such assessment was ever made. At this time the trust fund of $44,000.00 here involved represented about one-eighth of the approximately $361,000.00 of unsecured deposits held by the bank.

The bank continued to operate under the 1932 agreement as a going institution, but in 1934 it became apparent that the bank would be unable to fulfill the terms of said agreement and restore to the old depositors the right of withdrawal of their funds on July 1, 1935. This presented to the board of directors and the officers of the bank the question as to what alternative plan the bank could offer which would be acceptable to the depositors. The final outcome was that at a meeting of the board of directors in December, 1934 they decided to submit the following proposal to the old depositors: (1) the bank would pay the old depositors (that is, those who were depositors on July 28, 1932) 40% of the amount of their deposits as reduced by the 30% charge off under the 1932 agreement. (2) Payment to be made in two equal installments, one payable within thirty days after acceptance of the plan, and the other on July 1, 1935. (3) The depositors would release the bank from further liability on account of their deposits. (4) The depositors would receive certificates of participation in the proceeds of certain assets of the bank which were to be withdrawn and turned over to a trustee to liquidate for their benefit, and the Peoples Holding Company would also turn over to said trustee for the benefit of the depositors the assets it had received from the bank under the 1932 agreement. (5) All certificates of indebtedness issued to the depositors by the Peo-

ples Holding Company would be surrendered and cancelled, and all certificates of stock in the bank would be surrendered and cancelled.

The practical effect of the acceptance of this proposal by the old depositors was that they would receive 28% of the amount of their deposits as they stood immediately prior to the agreement of 1932 and their pro rata part of any net proceeds from the doubtful assets to be turned over to their trustee, in consideration of which they would release the bank from all liability for the remaining 72% of their deposits and would also release the stockholders from their statutory liability.

This proposal of December, 1934, also contemplated that the capital stock of the bank would be reduced from $50,-000.00 to $25,000.00, and when all the old stock was cancelled new stock would be issued for cash at par value in the amount of $25,000.00. It was also intended to raise $50,-000.00 of new capital, so as to bring in a total of $75,000.00 in new capital, by selling $50,000.00 of debentures. In addition the bank would assume full liability for all secured deposits and all deposits made subsequent to the agreement of 1932.

By June, 1935, more than two-thirds of the depositors in number and amount, excluding those having deposits of $10.00 or less, had accepted the bank's proposal in writing and on June 18, 1935, the Board of Bank Control passed a resolution approving the proposal and authorizing the bank to put it into effect, except that the Board declined to authorize the issuance of debentures.

Thereafter, in accordance with the terms of the 1935 agreement, the bank made two payments to the old depositors aggregating 28% of the amount which they had on deposit at the time of the adoption of the 1932 reorganization plan, and the specified assets were turned over to a trustee for depositors, who has since paid two dividends of 5% each

on the participation certificates issued by him. The old stock certificates of the bank were surrendered and cancelled; the new capital stock of $25,000.00 was duly subscribed and paid for; and the stockholders of the bank met on November 26, 1935, and authorized the reduction of the capital stock to $25,000.00. The operation of the bank has since been quite successful and it is now in excellent condition.

We shall first consider whether the executor Long and the estate of the executrix, Mrs. Holmes, are liable for any loss sustained by the trust growing out of the failure or refusal of the Peoples Bank to pay its depositors in full. The estate of the executor Marscher was not made a party to this action and we need not, therefore, determine its liability.

"The general rule in reference to the accountability of trustees is that they shall use such diligence in the management of the trust fund as a prudent man would do in relation to his own affairs, and that they shall not be charged with loss except for neglect of duty. *Turnipseed v. Sirrine,* 60 S. C., 272, 38 S. E., 423." *Oakes' Estate v. Oakes et al.,* 170 S. C., 167, 169 S. E., 890, 891; *International Shoe Co. v. U. S. Fidelity & Guaranty Co.,* 186 S. C., 271, 195 S. E., 546. In the application of this well-established rule it is generally held that if a trustee or other fiduciary in good faith deposits funds of the estate in a bank of good repute and standing and nothing occurs to indicate that the affairs of the bank are in such condition as would lead a reasonably prudent man to withdraw the funds, he is not liable for any loss which may occur through the subsequent failure of the bank; the test being whether he has exercised such care as men of common prudence ordinarily exercise in their own affairs. Such a fiduciary is not regarded as an insurer, but he is responsible for any such loss where he deposits such funds, or allows them to remain on deposit, when the bank is not in a sound financial condition and this fact is known to him or might have been known by the ex-

ercise of ordinary prudence and diligence. *Twitty v. Houser,* 7 S. C., 153; 21 Am. Jur., p. 533; annotation 60 A. L. R., 488.

■ Under the circumstances of the case does the conduct of these fiduciaries in allowing these trust funds to remain on deposit with this bank meet the requirements of the foregoing rule? After giving painstaking consideration to the voluminous record, we think the conclusion is inescapable that the executor Long was negligent in allowing these funds to remain on deposit and in making no effort to protect them at a time when in the exercise of ordinary care he knew, or should have known, that it was unsafe for such funds to remain in this bank.

While there is testimony that the bank was regarded by the general public as being in sound financial condition during this period, the executor Long did not occupy the position of an outsider. He was so closely connected with the bank as to have opportunity for more intimate knowledge of its affairs and condition than the general public and should, therefore, be held to a stricter responsibility than one who did not have such an opportunity. Long was one of the largest stockholders and a director. The only other bank in the town had failed. The unsatisfactory condition of the Peoples Bank was apparent to the directors and officers as early as 1926 or 1927. Its condition grew progressively worse. The position of the directors and officers was such that, regardless of what may have been the general reputation of the bank, they knew that it was in a serious financial condition. Although the record does not show that Long attended any of the meetings of the board of directors for several years prior to 1929, it is reasonable to assume that he had notice of these meetings and the purposes for which they were called. It is argued that he did not have actual knowledge of the facts disclosed at such meetings but, as stated by the referee, "the record does show that he had

notice of the meeting and of the purpose of the meeting when the question arose as to stockholders putting up· additional capital." This meeting was in 1930, or approximately two years before the attempt to reorganize in 1932. Apart from the foregoing, it is inconceivable that such a large stockholder in the bank, particularly where he was a man of large affairs residing in a community as small as this, made no effort whatsoever to keep up with its financial condition. He knew, or should have known, from the public statements of the bank, that there was a gradual drastic decline in the amount of deposits. The referee found that "Long was compelled to have known that the bank was not as sound financially as it had been in prior years". It is true that Long resigned as a director in the spring of 1929 and moved to Atlanta, Ga., but before he left his knowledge of the condition of this bank was such that no prudent person in his position would have allowed these trust funds to remain on deposit without taking any steps to protect the estate from loss. The record shows that Long had no funds on deposit in the bank at the time of the 1932 reorganization.

Surely all of the circumstances in this case were sufficient to cast the burden upon the trustees to make some explanation. The executor Marscher died in 1931 and the executrix died in 1938, so that Long, as sole surviving trustee and executor, was the only person in a position to explain why no steps were taken to insure the safety of these trust funds. He did not testify and the record fails to disclose any reason for his not doing so. If any explanation existed, it would seem that so important a fact should affirmatively appear in the record.

Long was in a difficult position, as is usually the case where one represents conflicting interests. He was a director of the bank, a stockholder owning $5,000.00 of stock in the bank, and a trustee of the Holmes trust, which probably had the largest unsecured deposit in the bank. As a

director it was his duty to preserve the assets of the bank for the equal benefit of all the depositors and other creditors. The performance of this duty might require the prompt closing of the bank or its continuance as long as possible as a going concern. His interest as a stockholder strongly suggested that the bank be kept going in order that he might avoid the statutory liability and might eventually retrieve his stock investment. As trustee of the Holmes trust it was his duty to protect the trust fund. If its withdrawal from the bank was necessary for its preservation, it was his duty to withdraw it regardless of the effect such withdrawal might have on the bank or on his interest in the bank. If the trust fund could not be withdrawn, it was his duty to do the next best thing for the protection of the fund, whatever effect his action may have had on the bank, on himself, or on others interested in the bank.

The difficulty and embarrassment in the situation due to the conflict of interests was brought about by Long's voluntary acts, and therefore he cannot complain if he is held to the standard of conduct uniformly required of trustees. The law does not recognize the right of a trustee to escape or minimize his obligation by putting himself in a position where his obligation to one trust conflicts with his obligation to another trust or with his personal interests. As was said in *Covey v. Pierce,* 229 Mo. App., 424, 82 S. W. (2d), 592, 599, in holding trustees liable under similar circumstances, "they accepted the trust fund and the care of it, to be managed in accordance with the mandates of equity and the law; and, in accordance with such mandates, they are required to administer it."

In *Anderson v. Ætna Casualty & Surety Co.,* 175 S. C., 254, 178 S. E., 819, 824, a bank receiver deposited receivership funds in the Peoples State Bank of South Carolina which thereafter failed. It appeared that the receiver was a former cashier of the local branch of the bank in which

the funds were deposited and was also a stockholder. The Court stated that the information which ordinary diligence would have disclosed "must have suggested to a person of ordinary care and prudence that the deposit be withdrawn from the bank", and the receiver was held personally liable for the loss sustained. We think the following observation of the Court in that case is applicable to the executor Long here: "It strains credulity to suggest that he had no inkling of the affairs of the bank in time to withdraw the receivership funds before the crash of the bank."

It may well be that an individual, from a sense of community pride and reluctance to prefer himself over his neighbors, might under the circumstances of this case have chosen to incur the risk of loss rather than withdraw his deposit and thereby contribute to the further embarrassment of the bank; but however praiseworthy such motives may be, a trustee is not at liberty to make such a contribution for his *cestui que* trust.

The referee found that the trustee Long was not negligent in the handling of the trust fund, and this conclusion was concurred in by the Circuit Judge. We are not unmindful of the rule that in an equity case findings of fact by a master or a referee, concurred in by a circuit judge, will not be disturbed by this Court unless it appears that such findings are against the clear preponderance of the evidence. *Alderman v. Alderman,* 178 S. C., 9, 181 S. E., 897, 105 A. L. R., 102. But that rule has no application here. It is not the findings of fact that we bring into question, but the legal conclusions drawn from the facts. After making certain factual findings which have been heretofore stated, the referee says: "I would be inclined to hold him (Long) liable for his failure to take the money out of the Peoples Bank if conditions had been normal." In concluding that Long should not be held liable, the referee said: "No prudent business man during this period could possi-

bly tell what should be done with his money. It appears to me that all he could do was to trust in God and his bank, and take the consequences * * * good banks during that period were just about as scarce as hen teeth. If he had taken the money out of the Beaufort bank, what would he have done with it? He could have easily, and would have most likely, jumped out of the frying pan into the fire * * *. Who knows that he could have gotten the money out of the Peoples Bank at any time after it became involved, for the attempted withdrawal of that amount may have brought about the closing of the bank at an earlier period."

The referee's description of prevailing economic conditions would hardly apply to the period when Long was a director of the bank. He resigned in the spring of 1929, at which time, as heretofore pointed out, the bank's condition was such that ordinary prudence would certainly have required him to take appropriate steps to protect these trust funds. The suggestion that the trustees probably could not have withdrawn these funds without bringing about the closing of the bank is answered by the fact that other depositors were successful in withdrawing their deposits during the period in question. Long made no effort whatsoever to withdraw any part of these funds. Ordinary prudence demanded that he acted before the bank's condition became so desperate that it would not permit substantial withdrawals. But even though banks generally were in an unsatisfactory condition, and we doubt if such a condition prevailed from 1927 to 1929, certainly ordinary prudence would have required that all the eggs be not placed in one basket, and funds withdrawn could have been reinvested as authorized by the Act of 1920, 21 St. at Large, p. 899, Section 9050, Code of 1932.

It follows from the foregoing conclusions that the executor Long should be required to account and held responsible for all trust funds left on deposit in

the Peoples Bank of Beaufort. There is no evidence in the record that the executrix, Mrs. Holmes, had any knowledge of the condition of the bank other than that of the general public, and while under all the circumstances the question of the responsibility of her estate is a rather close one, we are not disposed to reverse the conclusion of the Referee and Circuit Judge that her estate is not liable. Mrs. Holmes was a woman of limited business experience and largely entrusted the management of her affairs to Long. Long and the members of his family were the principal beneficiaries under the terms of her will.

The next question is whether the bank is liable for the amount of the trust funds on deposit which were not withdrawn. The answer to this question depends upon the validity of the reorganization plans and whether they are binding on depositors who did not consent thereto.

Both reorganizations were attempted under the terms of Section 1-A of Act No. 649 of the Acts of 1932, 37 St. at Large, page 1183. This act contains two sections. Section 1-A may be better understood by first stating the contents of Section 1. Under the terms of Section 1, when any bank has been duly adjudged insolvent in a proceeding instituted in the Court of Common Pleas, the Court is authorized to approve a plan of reorganization for the reopening of such bank under the following procedure: A verified petition must be filed by at least 5% in number and amount of depositors and stockholders setting forth that it would be to the advantage of the depositors and unsecured creditors to reorganize and reopen the bank and showing that it is feasible to reopen the bank on such a plan. If the representations contained in said petition "appear to the satisfaction of the said Judge to be true", the Court is required to fix by order a time and place for the holding of a meeting of depositors, creditors and stockholders "for the purpose of considering and determining upon a plan for the

reorganization and reopening of such institution." At least ten days' notice of the time, place and purpose of such meeting is required to be given by mail to each depositor, creditor and stockholder. "Before any such meeting shall be authorized to determine upon any plan of reorganization it must appear that not less than fifty (50%) per cent. of depositors, unsecured creditors and stockholders are present or duly represented. In the event that two-thirds (2/3) in number and amount, of all depositors, unsecured creditors and stockholders present at such meeting agree upon a plan of reorganization by resolution duly adopted and recommended the same" to the Court, the Court is then authorized, "if it appear to its satisfaction that such plan will be to the best interest of all parties", to approve such plan and order the reopening of such institution. When so approved such reorganization is binding on all depositors, creditors and stockholders. As a part of such reorganization plan, the Court is permitted "to authorize the reduction of depositors and unsecured creditors' claims and/or to postpone the payment thereof."

Section 1-A is as follows: "That on and after the approval of this Act it shall be lawful for any bank, now or hereafter placed in the hands of the State Banking Department and other than any banking institution that has been duly adjudged insolvent in an action or special proceeding duly instituted in the Court of Common Pleas, as outlined in paragraph one hereof, upon the consent of two-thirds of the depositors in number and amount, holding deposits in excess of ten dollars ($10.00) in the said bank, who shall agree in writing to an extension of payment of unsecured creditors of said bank, said writing to specify terms, and amount to be paid from time to time for a period not exceeding five years, for the officers to reopen the said bank, and to operate the same as a going banking institution; and all such agreements when signed by executors, trustees, ad-

ministrators, or committees for persons *non compos mentis*
shall be lawful, and binding upon the wards of such, and
shall be binding upon all depositors."

It will be observed that in reorganizing a bank under
Section 1, the plan may include a reduction in the amount
of depositors' claims as well as a postponement of the pay-
ment of such claims. The depositors and creditors favoring
any particular plan of reorganization have no power to im-
pose their will on a minority. They may agree on a pro-
posed plan and advise and recommend its acceptance, but
they are powerless to coerce. Their recommendation is not
effective until the Court, after being satisfied that such plan
will be to the best interest of all parties, approves it. All
parties having any objection to the plan are afforded an
opportunity to be heard before it is approved. On the other
hand, any plan for the reopening or reorganization of a
bank under Section 1-A must be limited solely to the ex-
tension of time for the payment of unsecured depositors or
other creditors. No authority is given to reduce the claim
of a depositor. The fact that any reorganization under this
section could not go beyond deferring the payment of un-
secured creditors for a limited period of time probably ac-
counts for the absence of any provision giving the minority
a right to be heard and object or of any provision requir-
ing the Court to approve the proposed plan. Evidently the
General Assembly concluded that the safeguards provided
in Section 1 were not necessary to a limited reorganization
as authorized under Section 1-A.

It is not contended in this case that any proceedings
were ever instituted in the Court of Common Pleas,
or that any effort was ever made to have the Court
approve either the agreement of 1932 or that of 1935. In
fact, the bank makes no attempt to sustain the validity of
these agreements under Section 1, but undertakes to do so
under Section 1-A. But it is apparent that neither plan of

reorganization can be sustained under this section. Both plans call for a reduction in the amount of liability of the bank to its depositors which Section 1-A does not authorize. Under the 1932 agreement depositors were required to release the bank from liability to the extent of 30% of their deposits, and under the 1935 agreement to the extent of 60% of the remainder. The referee held that the procedure followed exceeded the authority contained in the Act and was wholly unauthorized. We are in full accord with this conclusion.

There being no statutory authority for the procedure followed, what is the effect of the attempted reorganizations? The learned Circuit Judge held that the plan having been agreed to by more than 80% of the depositors and approved by the Bank Examiner and Board of Bank Control, and it appearing to his satisfaction that it was fair and equitable to all depositors, the Court was empowered under the general law to approve it and should now do so, stating that under these circumstances he could not see how the Courts "could allow one depositor to defeat the wishes of the other depositors of the bank." While courts of equity are generally held to have the inherent power to liquidate the affairs of an insolvent corporation, we seriously doubt the authority of the Courts, in the absence of an enabling statute, to scale down the debts of such a corporation and permit it to continue as a going concern with its liability thus reduced without the consent of all its creditors. The enactment of Section 1 of the Act of 1932 was a legislative recognition of this limitation, at least in the case of banks. Almost all, if not all, of the States have enacted statutes of the same general nature. The closing and liquidation of banks disastrously affects the whole community and results in the destruction of economic values to the injury of both depositors and stockholders. The amount realized upon the assets of such an institution is much

greater when collected by a "going" bank. It is to the interest of all that such an institution be rehabilitated by some fair plan of reorganization. The evident purpose of these statutes is to prevent a small minority from blocking an equitable plan of reorganization which is desired by a majority and found by a fair and impartial tribunal to be fair to such minority. But, however desirable such a reorganization may be, in the absence of any enabling statute, or where, as here, no attempt was made to comply with the terms of the enabling statute, we are unable to see how the Courts can enforce such an agreement against the objection of a nonassenting depositor.

In *Shepherd et al. v. Mt. Vernon Trust Co.,* 269 N. Y., 234, 199 N. E., 201, 204, the Court said: "It may be conceded that in the absence of a statute, a plan of reorganization of a bank could not be made binding upon any depositor who did not voluntarily consent to it. The purpose and result of the plan may be beneficial to all directly concerned and may avert a threatened disaster to the community. None the less it does change, in some degree, the contractual rights and obligations of the parties, and such change can be effected only by unanimous agreement or by provision of law. A single depositor might selfishly interpose objections for the purpose of preserving rights which he may, though mistakenly, deem beneficial to himself, or even for the purpose of extorting an unfair benefit to himself as the price of withdrawing his objections. In that way the desire of the majority to arrange a plan which will benefit all may be thwarted."

In *Shekell v. Ypsilanti Savings Bank,* 267 Mich., 114, 255 N. W., 172, 173, the bank was placed in the hands of a receiver. Ninety-six per cent. of the depositors signed an agreement providing for a reorganization and reopening of the bank, which was approved by the banking commissioner. Thereupon the Court discharged the receiver and permit-

ted the bank to reopen. Plaintiff did not join in the agreement and brought suit against the bank for the amount of his deposit. The bank claimed that to pay plaintiff in full would result in illegal preference among depositors in the same class. The Court held that the non-assenting depositors were not bound by the agreement and permitted recovery, stating that "in the absence of statute or insolvency proceedings, compositions with creditors are binding only on those who assent."

In the case of *Bank of Murray v. Farmers' Bank of Hazel,* 257 Ky., 251, 77 S. W. (2d), 624, 627, the defendant bank was beset with financial difficulties and an agreement providing for a reorganization was entered into and signed by more than 90% of the stockholders and depositors. However, the proposed reorganization was not in conformity with the banking law. Thereafter a nonassenting depositor sought to recover the amount of his deposit. It was contended that the effect of the reorganization was to create a "new" bank; that the financial condition of the "old" bank was such that the depositors would not have received more than 60% if the bank had been liquidated; and if the nonassenting depositors were not bound by the reorganization agreement, that in no event should they be paid more than they would have received through liquidation. Judgment for the depositor in the amount of his deposit was sustained. The Court said: "Since appellee did not join in the reorganization agreement or otherwise assent to a reduction of its deposit, we find no statute or principle of equity that would, in the circumstances, relieve appellant of its full liability thereon."

The case of *Island City Savings Bank v. Sachtleben,* 67 Tex., 420, 3 S. W., 733, is to the same effect. There several days after the bank closed a public meeting of the depositors was held at which, from an investigation of the affairs of the bank, it was determined that the assets would not

pay more than 74% to depositors. A reorganization was attempted by which $20,000.00 in new capital was subscribed and a new association formed to which was transferred the name and franchise of the old bank, together with all of its assets, and which obligated itself to pay the old depositors 74% of their claims, nearly all of whom agreed to accept this amount in payment of their deposits. In holding that the "new" bank was not relieved of liability to depositors who had not consented to the reorganization, the Court said: "The bank in this case was insolvent but there is no rule of law to prevent the stockholders of the insolvent corporation from transferring their interest to others who were willing and able to put it upon a solvent footing, and to enable it to carry on the business for which it was originally organized. That this was done, in fact, we think the findings of the court sufficiently show. There being a mere change of membership, and not a change of the corporation itself, it follows that the obligations existing against the original organization before continued to exist against it when reorganized."

Again in *Westveer et al. v. Ter Keurst et al.*, 276 Mich., 277, 267 N. W., 834, 835, the Court, in speaking of the effect of a reorganization of a bank upon its legal entity, said: "While a reorganization of the bank has been effected, its legal entity is unchanged. Its affairs were not wound up, nor its existence terminated. There was no new charter. True, the bank closed, but the same bank reopened under the reorganization plan. The reorganization did not dissolve the old corporation nor create a new one. Its entity remained." Also, see *First State Bank v. Lee,* 65 Okl., 280, 166 P., 186, L. R. A., 1819B, 609.

Respondents strongly rely on the case of *Griffin et al. v. Allendale Bank et al.,* 160 S. C., 502, 158 S. E., 813, to support the conclusion reached by the lower Court. But there the complaining depositor executed the agreement pro-

viding for a reduction in the liability of the bank to its depositors. The Court held that the agreement was based on a valuable consideration and was binding on those who executed it. It was further held that those depositors who accepted the benefits of the agreement were estopped to deny its validity. The rights of a nonassenting depositor were not involved.

The referee, after holding that the reorganization agreements were invalid, concluded that the nonassenting depositors were not entitled to recover the full amount of their deposits against the reorganized bank because it was now, in legal effect, a "new" bank, and that the "new" bank was only liable to these depositors for their pro rata share in the amount, if any, by which the value of the assets retained by the reorganized bank, after deducting the amount of secured deposits, new deposits and other preferred claims, exceeded the 28% dividend paid by the "new" bank under the 1935 plan of reorganization. His conclusion as to the extent of the liability of the reorganized bank seems to have been adopted by the learned Circuit Judge. For the reasons heretofore expressed, we think that these conclusions were erroneous. It is our view, and we so hold, that, in the absence of estoppel or waiver, the reorganization agreements of 1932 and 1935 did not affect the liability of the bank for the payment in full to those depositors who did not consent thereto.

However, although the reorganizations were invalid, those consenting thereto, as well as those who availed themselves of the benefits of the plans of reorganization, are now estopped to urge their invalidity. *Griffin et al. v. Allendale Bank et al., supra; Waesche v. Thurmont Bank,* 174 Md., 382, 198 A., 728; *Paine v. Fox et al.,* 172 Tenn., 290, 112 S. W. (2d), 1; *McIntyre v. Guarantee Trust Co.,* D. C., 39 F. Supp., 890; *Dobbs v. People's State Bank,* 265 Ky., 117, 95 S. W. (2d), 1111; *Shepherd et al.*

*v. Mt. Vernon Trust Co., supra,* 269 N. Y., 234, 199 N. E., 201; *McSweeney v. Equitable Trust Co.,* 127 N. J. L., 299, 22 A. (2d), 282, 139 A. L. R., 653, and annotation to said case beginning on page 659. It has further been held that a bank depositor intending to attack the validity of a plan to reorganize the bank should act promptly in order that others may not be misled to their prejudice. *Dobbs v. People's State Bank, supra.*

Does the trust estate occupy the position of a nonassenting depositor? If so, is it estopped to urge the invalidity of the two plans of reorganization?

On July 24, 1932, the executor Long wired the bank, stating that he felt that the 1932 agreement was for the best interest of the estate and if legally authorized to bind the estate, he desired to join in the execution of the proposed reorganization agreement. On February 20, 1935, the attorney for the surviving executor and the executrix filed a petition in the Probate Court seeking permission to accept income debentures of the bank in the amount then on deposit in said bank. On February 26, 1935, this permission was granted by the Probate Court and petitioners were authorized to accept these debentures in lieu of the deposit. (The plan for issuing debentures was never approved by the bank examiner, rendering it impossible to carry out the terms of this order). On January 7, 1939, a verified petition was filed by the executor Long purporting to show the assets of the trust in his hands which were ready for distribution to the beneficiaries. The losses claimed to have resulted from the inability of the Peoples Bank to pay its depositors in full were set out in the petition and petitioner stated that he had on hand, in addition to certain other assets, participation certificates issued to him under the 1935 reorganization plan of the bank. On January 9, 1939, the Probate Court issued an order directing the petitioner to pay to each of the beneficiaries its proportionate share of

the funds on hand and the assignment to each of its proportionate share in the participation certificates. Thereafter Long offered to assign to appellants their interest in these participation certificates, but appellants declined to accept any interest therein. All of the foregoing proceedings in the Probate Court were *ex parte*. Appellants were not parties to, nor does the record show that they had any notice of, these proceedings.

Under Section 1-A of the 1932 Act executors and trustees were authorized to agree to an extension of time for the payment of funds held by them on deposit but this, of course, would not authorize them to consent to a release of the bank from liability for any portion of such deposit. We think it is also clear that the beneficiaries were not bound by the foregoing proceedings in the Probate Court to which they were not parties. In *Hood v. Cannon*, 178 S. C., 94, 182 S. E., 306, the trust estate owned certain bank stock. It was proposed to merge this bank and others and form a new banking corporation. The trustee filed an *ex parte* petition in the Probate Court for the purpose of obtaining the approval of said Court to exchange the bank stock then held for stock in the newly formed bank. On this petition, an order of the Probate Court purporting to authorize the exchange was issued. The Court held that it was indispensable that the beneficiaries be made parties to such a proceeding and, not having been made parties, that they were not bound thereby. It was further held that such a judgment was void and could be collaterally attacked, as a mere inspection of the judgment disclosed that there was a fatal defect in that the beneficiaries of the trust were not made parties to the proceedings.

The effect of the reorganization agreement was to compromise the indebtedness owing by the bank to its depositors. Were the executors or trustees empowered to make such a compromise without authority from

the Court? The following rule laid down in *Bacot v. Hey-ward,* 5 S. C., 441, is well established: "It connot be questioned that, as a general right, incident to his office, a trustee has no power to compromise a debt on behalf of his *cestui que* trust. \* \* \* While, however, the general right is withheld, its denial is subject to conditions and exceptions which qualify the rule. If the Court which is asked to vacate it finds, from an examination of the circumstances under which it was made, that its sanction to the trustee, if previously applied for, would have been accorded, it will recognize it as an act consistent with the principles and doctrines which it enforces, and sustain it." Also, see *Geigers v. Kaigler,* 9 S. C., 401; *Pool v. Dial,* 10 S. C., 440; *Pickett v. Geer et al.,* 156 S. C., 346, 153 S. E., 349.

If the trustees were not empowered to consent to the reorganization plans, it necessarily follows that they could not create an estoppel against the beneficiaries of the trust. Should the Court now approve the action of Long in accepting the benefits of the reorganization plans? After careful consideration of the record, we think not. The unsecured depositors have received less than one-third of their deposits and will receive little, if any, more. Under both agreements the statutory liability of the stockholders was wholly ignored. This liability amounted to $50,000.00. In the bank examiner's report of May, 1933, it was estimated that 70% of this amount, or $35,000.00 was collectible, sufficient to have paid an additional dividend of at least 10% to the unsecured depositors. No explanation whatever has been given of the failure to enforce this liability. There were other irregularities which we will not undertake to discuss. The reorganized bank suffered no loss in paying the 28% dividend to the old depositors, as the value of the assets retained by the bank, after deducting all liabilities, was at least equal to the amount of this dividend. We think it is clear that the chief beneficiaries of the reorganization plans

were the old stockholders of the bank. The majority of the stockholders in the reorganized bank were stockholders in the old institution. Of course, the community was immensely benefited by keeping the bank open. It may very well be that the great majority of the depositors were agreeable to waiving their right to enforce the stockholders' liability in order to keep this institution as a going bank. But this motive cannot properly be considered by us in determining whether the reorganization should be approved. We do not undertake to impugn the motives of the officers of the bank or others who were instrumental in bringing about the reorganization. They may have acted in the utmost good faith. But here we are considering the rights of the beneficiaries of a trust fund and can only dispassionately consider whether the transactions were for their best interests.

Finally, counsel for the bank says that appellants accepted from the executor Long payments which included the proceeds of the 28% dividend paid by the bank and the dividends paid on the participation certificates, and contends that by reason thereof appellants are now estopped to deny the validity of the reorganization plans. This question was not raised in the pleadings or passed upon by the lower Court, and appears to have been mentioned for the first time in the brief of counsel for the bank. The only reference in the answer of the bank to waiver or estoppel is the allegation that appellants had full knowledge of the reorganization plans, raised no objection thereto and fully acquiesced therein; that more than six years have elapsed since the approval of said plans; and "this defendant pleads the statutory laws of the State of South Carolina as a bar to any action which the plaintiffs might have had against this defendant". There is no testimony whatsoever that appellants, prior to 1939, knew that any of the trust funds were on deposit in this bank or that they had any knowledge of the reorganization plans. This action was com-

menced during that year. Apart from the foregoing, we do not think the bank has proved an estoppel. Appellants expressly declined to accept from Long any assignment of the participation certificates. They received this money from him and not from the bank. The payments to appellants included other funds of the trust which had no connection with the deposit left in the bank. The record is silent as to the circumstances under which appellants received this money from Long. It is not shown that it was received with full knowledge of all the facts surrounding the transaction; nor does the record disclose whether this money was received with or without prejudice. The burden of proving an estoppel was on the bank and we think they have failed to prove it.

It follows from the foregoing that both Long and ██ the bank are liable to the appellants for their proportionate share of the funds left on deposit in the bank. The principal of this deposit amounted to $44,000.00. There has been paid over to the beneficiaries of the trust $14,215.57. These payments represent the 28% dividend paid by the bank and two 5% dividends on the participation certificates. Deducting these payments from the principal sum of $44,000.00 leaves an unpaid balance of $29,784.43. Under the terms of the trust appellants are entitled to 60/61 of the corpus so that their interest in this balance amounts to $29,296.16. They are entitled to judgment against R. A. Long and the bank for said sum of $29,296.16. A wide discretion is vested in the Courts in determining whether interest shall be allowed in equity cases. *Glenn v. Worthy et al.,* 169 S. C., 263, 168 S. E., 705; *Beacham v. Ross et al.,* 187 S. C., 398, 197 S. E., 369. A consideration of all the circumstances in our efforts to arrive at a just and equitable result leads us to the conclusion that said respondents should not be charged with interest on this amount. Of course, costs should be taxed against these respondents.

There has also been paid to the beneficiaries the sum of $17,144.96, representing funds of the trust which were deposited in other banks and not involved in this controversy.

In settling the "case" for appeal the lower Court excluded various exhibits which were included in the proposed "case" submitted by appellants. We think these exhibits were relevant to the issues raised by the exceptions and were improperly excluded. Appellants' appeal from this order is sustained.

Both judgments of the lower Court are reversed and the case is remanded to the lower Court for entry of judgment in accordance with the views herein expressed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES and TAYLOR concur.